**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 24-cv-00406-NYW-KAS

STOCK INSURANCE GROUP, INC. d/b/a RECAPTURE INSURANCE, INC.,

Plaintiff,

v.

HUB INTERNATIONAL NORTHEAST LIMITED,

Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the Court on (1) Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Cross-Motion"), [Doc. 44]; (2) Plaintiff's Motion to Exclude Expert Opinions ("Motion to Exclude"), [Doc. 45]; and (3) Defendant's Motion for Summary Judgment ("Defendant's Cross-Motion"), [Doc. 46]. All three Motions are fully briefed. The Court concludes that oral argument would not materially assist in the resolution of the Motions. For the reasons set forth below, Plaintiff's Cross-Motion is respectfully **GRANTED**, Defendant's Cross-Motion is respectfully **GRANTED in part** and **DENIED in part**, and the Motion to Exclude is respectfully **DENIED as moot**.

**BACKGROUND**[1]

This case involves a contract dispute between two insurance brokers. Defendant HUB International Northeast Limited ("HUB" or "Defendant") is a retail broker for companies in the ambulance industry. Plaintiff Stock Insurance Group, Inc. d/b/a

---

[1] The Court draws this summary from the Undisputed Material Facts set out below. *See infra* pp. 5–8.

Recapture Insurance, Inc. ("Recapture" or "Plaintiff") is a wholesale broker with experience in captive insurance.[2] Recapture works as an intermediary between insurance providers and retail brokers like HUB. In May 2021, Recapture assisted in placing a captive insurance policy for one of HUB's clients. In June 2021, HUB and Recapture entered into a Consulting and Brokerage Agreement ("Agreement"). [Doc. 46-5]. The Agreement included an "Exclusivity/Non-Circumvention" provision that prohibits HUB from "directly or indirectly engag[ing] to utilize the services of any vendor, partner, or carrier introduced by [Recapture] or otherwise circumvent[ing] [Recapture] for the purposes of obtaining services introduced or provided by [Recapture]." [*Id.* at § 10]. The Agreement also permits either party to terminate it, with or without cause, upon 90 days' written notice. [*Id.* at § 8].

In September 2021, HUB and Recapture began working to secure a captive insurance proposal for another of HUB's clients. Recapture initially worked with one insurance carrier, Oxford Risk Management Group ("Oxford"), but was unable to obtain a proposal. Oxford then terminated its relationship with Recapture, citing "highly inappropriate" conduct and "confrontational communications" by Recapture's owner, Zach Stock ("Mr. Stock"). Later, at Mr. Stock's suggestion, HUB contacted Oxford directly to work toward a proposal. HUB ultimately submitted two proposals to its client: one from Oxford and one from another carrier that Recapture had worked with. The client chose Oxford. When Mr. Stock discovered this, he became upset and accused HUB of hiding its negotiations with Oxford. Shortly afterward, HUB notified Mr. Stock and Recapture

---

[2] Captive insurance companies are subsidiaries created to insure their parent companies. *See* 3 Couch on Insurance § 39:2 (3d ed., June 2026 update).

that it was terminating the Agreement.

Recapture initiated this suit in state court in January 2024, and HUB removed to this Court. [Doc. 1; Doc. 5 at 1]. Recapture brings four claims: (1) breach of contract ("Claim One"), (2) breach of the implied covenant of good faith and fair dealing ("Claim Two"), (3) promissory estoppel ("Claim Three"), and (4) unjust enrichment ("Claim Four"). [Doc. 5 at ¶¶ 36–59]. HUB now moves for summary judgment in its favor on all claims, [Doc. 46]. Recapture cross-moves for summary judgment on the breach of contract claim on the issue of liability. [Doc. 44]. Recapture also moves to exclude certain opinions from HUB's insurance industry expert. [Doc. 45]. Because the Court's ruling on the Cross-Motions moots the Motion to Exclude, the Court resolves the Cross-Motions first.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019). The denial of one cross-motion does not require the grant of the other. *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). In considering the evidence in the record, the Court cannot and does not weigh

the evidence or determine the credibility of witnesses. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank*, 916 F.3d at 1326.

Although cross-motions for summary judgment are held to the same standard, this standard applies differently depending on whether the movant bears the burden of persuasion at trial. A movant that does not bear the burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). To satisfy this burden, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

However, "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*

## UNDISPUTED MATERIAL FACTS ("UMF")

1. HUB is an insurance broker with experience in multiple fields, including serving as a retail broker for companies in the ambulance industry. [Doc. 46 at ¶ 1; Doc. 53 at ¶ 1].

2. Recapture is a wholesale insurance broker that serves as an intermediary between retail brokers like HUB and insurance providers. Zach Stock is Recapture's sole owner and employee. [Doc. 46 at ¶ 2; Doc. 53 at ¶ 2].

3. Mr. Stock and Recapture have experience in the area of captive insurance. Mr. Stock maintains an "extensive" network of captive insurance providers and clients. [Doc. 44 at ¶¶ 1–3; Doc. 47 at ¶¶ 1–3; Doc. 44-1 at ¶¶ 2–4].[3]

4. In 2020, Recapture entered into a wholesale brokerage agreement with Oxford Risk Management. [Doc. 46 at ¶ 3; Doc. 53 at ¶ 3].

5. In February 2021, Mr. Stock was introduced to HUB employees Mark Tauber ("Mr. Tauber") and Esther Burger ("Ms. Burger"). [Doc. 46 at ¶ 4; Doc. 53 at ¶ 4].

[3] HUB claims that the statements in Mr. Stock's affidavit, [Doc. 44-1], are not competent summary-judgment evidence because they are "self-serving," [Doc. 47 at ¶ 1]. But "virtually any party's testimony can be considered 'self-serving,'" and a declaration, even a self-serving one, "is competent summary judgment evidence if it 'is based upon personal knowledge and sets forth facts that would be admissible in evidence.'" *Assessment Techs. Inst., LLC v. Parkes*, 588 F. Supp. 3d 1178, 1193 (D. Kan. 2022) (first quoting *Greer v. City of Wichita*, 943 F.3d 1320, 1325 (10th Cir. 2019); and then quoting *Janny v. Gamez*, 8 F.4th 883, 900 (10th Cir. 2021)) (considering supposedly self-serving declaration in resolving cross-motions for summary judgment). To the extent HUB disputes Mr. Stock's affidavit without setting out any supporting facts or evidence, the Court deems those facts undisputed. *See* Fed. R. Civ. P. 56(e)(2); NYW Civ. Practice Standard § 7.1D(b)(4).

6. Mr. Tauber was introduced to Mr. Stock because of Mr. Stock's connections to captive insurance providers. [Doc. 44 at ¶ 5; Doc. 47 at ¶ 5; Doc. 44-1 at ¶ 6; Doc. 44-2 at 27:10–29:21].

7. After the introduction, HUB and Recapture began discussing insurance options for HUB's client Citywide Ambulance ("Citywide"). [Doc. 46 at ¶ 5; Doc. 53 at ¶ 5].

8. Citywide was presented with a guaranteed cost policy from a traditional insurance carrier and a captive insurance program from ProSight insurance and Oxford. [Doc. 46 at ¶ 6; Doc. 53 at ¶ 6].

9. Citywide chose the ProSight/Oxford option in May 2021. [Doc. 46 at ¶ 7; Doc. 53 at ¶ 7].

10. In June 2021, Recapture and HUB entered into the Agreement. [Doc. 46 at ¶ 8; Doc. 53 at ¶ 8; Doc. 46-5].

11. Section 8 of the Agreement allows it to be terminated by either party, with or without cause, on 90 days' written notice. [Doc. 46-5 at § 8; Doc. 46 at ¶ 9; Doc. 53 at ¶ 9].

12. Section 10 states as follows:

> Exclusivity/Non-Circumvention. During the Term of this Agreement and for a period of one (1) year after the termination of this agreement, [HUB] shall not, directly or indirectly engage to utilize the services of any vendor, partner, or carrier introduced by [Recapture] or otherwise circumvent [Recapture] for the purposes of obtaining services introduced or provided by [Recapture]. If [HUB] violates this clause of the agreement, they agree to pay a penalty of 300% of the commission or fee's [sic] that should have been earned by [Recapture].

[Doc. 46-5 at § 10; Doc. 46 at ¶ 10; Doc. 53 at ¶ 10].

13. Mr. Stock testified that this provision does not expressly contemplate a situation where an insurance carrier or provider refuses to work with Recapture. [Doc. 46 at ¶ 11; Doc. 53 at ¶ 11; Doc. 46-2 at 148:4–8].

14. Section 13(c) is a choice-of-law provision selecting Colorado law as governing the Agreement. [Doc. 46-5 at § 13(c); Doc. 46 at ¶ 12; Doc. 53 at ¶ 12].

15. Section 13(f) provides that any term of the Agreement may be amended or waived, but "only upon the mutual written consent" of HUB and Recapture. [Doc. 46-5 at § 13(f) (the "anti-waiver provision"); Doc. 46 at ¶ 13; Doc. 53 at ¶ 13].

16. Section 13(h) is an integration clause confirming that the Agreement is the Parties' entire agreement. [Doc. 46-5 at § 13(h); Doc. 46 at ¶ 14; Doc. 53 at ¶ 14].

17. Section 13(l) is entitled "No Waiver" and provides, "No failure on the part of [Recapture] to exercise and no delay in exercising any right, power, remedy hereunder shall operate as a waiver thereof; nor shall any exercise thereof, or the exercise of any other right, power or remedy hereunder." [Doc. 46-5 at § 13(l)].

18. Later in 2021, Recapture and HUB began working to place a captive insurance policy for HUB's client Crest Transportation ("Crest"), whose existing coverage expired September 14, 2021. [Doc. 46 at ¶ 15; Doc. 53 at ¶ 15].

19. Although Recapture had been working with Oxford to obtain a policy for Crest, Mr. Stock notified HUB on September 10, 2021 that Recapture was unable to secure a bindable proposal from Oxford. [Doc. 46 at ¶ 16; Doc. 53 at ¶ 16; Doc. 46-2 at 24:14–22].[4]

[4] Recapture marks this fact as disputed but only disputes HUB's characterization of communications prior to September 10. [Doc. 53 at ¶ 16]. Accordingly, the Court deems this fact undisputed. *See* Fed R. Civ. P. 56(e).

20. Mr. Stock told Ms. Burger that he had a "screaming match" with Oxford because Oxford "screwed this up." [Doc. 46 at ¶ 17; Doc. 53 at ¶ 17; Doc. 46-7 at 2].

21. HUB obtained an extension of Crest's existing coverage, but Recapture's efforts to secure a bindable proposal from Oxford were unsuccessful. [Doc. 46 at ¶ 19; Doc. 53 at ¶ 19].

22. Recapture, through Mr. Stock, then provided HUB with contact information for Oxford and recommended that HUB contact Oxford directly to try and secure a bindable proposal for Crest. [Doc. 46 at ¶ 20; Doc. 53 at ¶ 20; Doc. 44-1 at ¶ 11; Doc. 46-8 at 2].

23. On October 11, 2021, Oxford terminated its relationship with Recapture, citing "highly inappropriate" conduct and "confrontational communications."[5] [Doc. 46 at ¶ 22; Doc. 53 at ¶ 22; Doc. 46-2 at 120:24–122:16].

24. Oxford refused to work with Mr. Stock and Recapture from October 2021 to at least March 2022. [Doc. 46 at ¶ 23; Doc. 53 at ¶ 23; Doc. 46-2 at 145:5–13]].

25. HUB continued to work with Recapture and Oxford—independently of each other—to obtain a captive proposal for Crest. [Doc. 46 at ¶ 24; Doc. 53 at ¶ 24].

26. HUB presented Crest a proposal from Oxford and a proposal from Recapture through PMA insurance. [Doc. 46 at ¶ 25; Doc. 53 at ¶ 25].

27. Crest chose Oxford's proposal in March 2022. [Doc. 46 at ¶ 26; Doc. 53 at ¶ 26].

---

[5] Recapture denies any misconduct but does not dispute the content of Oxford's communications. [Doc. 53 at ¶ 22].

28. After HUB informed Recapture that Crest selected Oxford's proposal, Mr. Stock became upset and accused HUB of hiding its negotiations with Oxford. [Doc. 46 at ¶ 27; Doc. 53 at ¶ 27; Doc. 46-12].

29. On March 16, 2021, HUB notified Recapture that it was terminating the Agreement, effective in 90 days. [Doc. 46 at ¶ 28; Doc. 53 at ¶ 28; Doc. 46-13].

30. Within a year of terminating the Agreement, HUB placed two more captive insurance policies through Oxford, without Recapture's involvement. [Doc. 44 at ¶ 19–20; Doc. 47 at ¶¶ 19–20].[6]

**ANALYSIS**

Neither Party attacks the validity of the Agreement's choice-of-law provision, so the Court joins the Parties in assuming that Colorado law controls. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008). When sitting in diversity, the Court's role is to "ascertain and apply" Colorado law with the objective of reaching the same result that would be obtained in state court. *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 930 (10th Cir. 2018) (quotation omitted). Where the Colorado Supreme Court has not yet ruled on an issue, the Court must predict how it would rule "if faced with the same facts and issue." *McAnulty v. Standard Ins. Co.*, 81 F.4th 1091, 1103 (10th Cir. 2023) (quotation omitted). The Court generally follows decisions from the Colorado Court of Appeals "absent convincing evidence that the highest court would decide otherwise." *Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194,

[6] HUB denies portions of this fact based on its objection to Mr. Stock's affidavit but does not cite any evidence establishing a genuine factual dispute. [Doc. 47 at ¶¶ 19–20]. Having already rejected HUB's evidentiary argument, *see supra* note 2, the Court deems this fact undisputed under Rule 56(e)(2).

1204 (10th Cir. 2011) (quotation omitted). The Court may also consider treatises, Restatements, decisions from other jurisdictions, and the "general weight and trend of authority." *Siloam Springs*, 906 F.3d at 930–31 (quotation omitted); *Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 483 (10th Cir. 2023).

## I. Breach of Contract Claim

Under Colorado law, to prevail on a claim for breach of contract, the plaintiff must prove (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

In its breach of contract claim, Recapture asserts that HUB violated the Agreement's Exclusivity/Non-Circumvention provision by working directly with Oxford to obtain an insurance proposal. *See* [Doc. 44 at 9–11]. Each Party seeks summary judgment on this claim, both on the issue of breach and on several defenses asserted by HUB. The Parties do not dispute that a contract existed and that Recapture has suffered damages. The Court addresses the Parties' arguments in turn.

### A. Breach of the Exclusivity/Non-Circumvention Provision

Contract interpretation is a question of law. *Ad Two, Inc., v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). When interpreting the Agreement, the Court's primary goal is to determine and effectuate the intent of the Parties. *Id.* This inquiry focuses on the plain language of the contract itself. *Id.* Courts ascertain the meaning of a contract "by examining the entire instrument and not by viewing clauses or phrases in isolation." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009). "Written contracts that are complete and free from ambiguity will be found to express the intention

of the parties and will be enforced according to their plain language." *Ad Two*, 9 P.3d at 376.

The Agreement's Exclusivity/Non-Circumvention provision states that HUB "shall not, directly or indirectly engage to utilize the services of any vendor, partner, or carrier introduced by [Recapture] or otherwise circumvent [Recapture] for the purposes of obtaining services introduced or provided by [Recapture]." [Doc. 46-5 § 10]. HUB argues that this language implicitly requires "an existing business relationship between Recapture and a third-party carrier" and does not apply if a carrier severs its relationship with Recapture. [Doc. 46 at 8]. Recapture counters that the Agreement contains no such requirement and flatly prohibits HUB from "doing business with a carrier introduced to Hub by Recapture." [Doc. 53 at 9–10]; *see also* [Doc. 44 at 10]. The Court respectfully agrees with Recapture.

Contrary to the specific language of the non-circumvention provision in sole authority upon which HUB relies, *see* [Doc. 48 at 9 (citing *Branta v. Newfield*, 310 F. Supp. 3d 1166, 1202–03 (D. Colo. 2018) (quoting the non-circumvention provision as only prohibiting the defendant from contacting "persons having existing or prospective business relations with [the plaintiff] or its subsidiaries")], section 8 of the Agreement does not require any ongoing relationship. By its plain terms, the Exclusivity/Non-Circumvention provision does not depend on an ongoing relationship between Recapture and the companies it introduces to HUB. The Court agrees with Recapture that the "or" separating the "directly or indirectly engage" clause and the "otherwise circumvent" clause should be read disjunctively. *See, e.g.*, *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 571 (Colo. 2008) ("Generally, we presume the disjunctive use of the word 'or'

marks distinctive categories." (statutory interpretation context)); *SOLIDFX, LLC v. Jeppeson Sanderson, Inc.*, 841 F.3d 827, 836 (10th Cir. 2016) (reading "or" disjunctively when applying Colorado contract law); 17A C.J.S. *Contracts* § 428 (Apr. 2026 update) ("[T]he word 'or' is of a disjunctive nature"). Thus, this provision sets out two independent bases for breach, one of which is "directly or indirectly engag[ing] to utilize the services" of a company "introduced by Recapture." And the title of this provision, "Exclusivity/Non-Circumvention," confirms that the provision serves dual purposes of both protecting Recapture's existing relationships and ensuring that, if HUB does business with companies introduced by Recapture, it does so *exclusively* through Recapture. *See Rockhill Ins. Co. v. CFI-Glob. Fisheries Mgmt.*, 782 F. App'x 667, 672 n.1 (10th Cir. 2019) ("Colorado courts refer to headings in interpreting contracts." (citing *FDIC v. Fisher*, 292 P.3d 934, 937 (Colo. 2013)). HUB's effort to read in an ongoing-relationship requirement invites the Court to rewrite the contract. Colorado courts disfavor such a result, *see, e.g.*, *In re Marriage of Hall*, 681 P.2d 543, 544 (Colo. App. 1984), and the Court declines to interpret the Agreement in this manner, especially when the plain language is unambiguous.

The Court therefore concludes that there is no genuine dispute that HUB breached the Agreement's Exclusivity/Non-Circumvention provision by directly engaging Oxford to utilize its services. The Court turns to HUB's defenses.

**B. Impracticability**

Recapture seeks summary judgment on HUB's impossibility defense. *See* [Doc. 44 at 13–14]; *see also* [Doc. 16 at 6 ¶ 9]. HUB did not cross-move on this defense. *See* [Doc. 46]. Performance of a contract is considered "impossible" when "an unanticipated

circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract." *Magnetic Copy Servs., Inc. v. Seismic Specialists, Inc.*, 805 P.2d 1161, 1165 (Colo. App. 1990) (quoting *City of Littleton v Emps. Fire Ins. Co.*, 453 P.2d 810, 812 (Colo. 1969)). In this context, "impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *City of Littleton*, 453 P.2d at 812.[7]

Recapture argues that HUB's performance was not impracticable, because "[n]othing was stopping [HUB] from paying Recapture if it chose to work directly with Oxford." [Doc. 44 at 13]. Nor is there any sign that it was impossible for HUB to *not* work with Oxford. Other captive insurance providers existed, and Recapture in fact obtained a proposal for Crest from one of those providers.

Rather than disputing this, HUB argues that its breach should be excused because it became impossible for *Recapture* to perform. *See* [Doc. 47 at 14–15]. In principle, HUB is correct that "[a] party's prospective failure of performance may . . . discharge the other party's duties or allow him to suspend performance . . . even though the failure would be justified" based on impracticability or another rule. Restatement (Second) of

[7] For purposes of this Order, the Court assumes that impossibility and frustration of purpose defenses present mixed questions of law and fact. The Colorado Court of Appeals has indicated that determining whether a certain condition is a "basic assumption" of a contract may present an issue of fact. *Town of Fraser v. Davis*, 644 P.2d 100, 101 (Colo. App. 1982). But "when the controlling facts are undisputed[,] the legal effect of those facts constitutes a question of law." *Atl. Richfield Co. v. Whiting Oil & Gas Corp.*, 320 P.3d 1179, 1184 (Colo. 2014). As the Court explains, HUB identifies no genuine factual disputes that preclude summary judgment on these defenses.

Contracts § 268(1) (A.L.I. 1981) ("Restatement").[8] The Court agrees with Recapture, however, that there was no prospective failure of performance on Recapture's part.

As Recapture points out, the Agreement does not obligate Recapture to place insurance coverage for Hub's clients with Oxford. *See* [Doc. 55 at 8]. The Agreement states that Recapture's "scope of service is limited to assisting [HUB] with the placement of requested insurance coverage and access to [Recapture's] network of service providers." [Doc. 46-5 at § 9]. Recapture did just that. It introduced HUB to Oxford and other captive insurance providers and assisted HUB by obtaining a proposal from another provider, even after Oxford cut Recapture off. Because Oxford's termination of its relationship with Recapture did not "destroy all possibility of [Recapture's] performance" or otherwise make performance impracticable, [Doc. 47 at 13], HUB fails to adduce sufficient facts to avoid summary judgment on its impossibility defense. Plaintiff's Cross-Motion is respectfully **GRANTED** as to this defense.

### C. Frustration of Purpose

HUB also argues that its breach is excused due to a frustration of purpose. [Doc. 46 at 9–12]. Both Parties seek summary judgment on this defense. [*Id.*; Doc. 44 at 14–15].

Unlike impossibility, which contemplates an "impediment to performance," the

---

[8] While HUB cites no Colorado cases (or any other authorities) following this rule, Colorado courts have followed related provisions from the Restatement dealing with impracticability and frustration. *See, e.g.*, *Magnetic Copy Servs.*, 805 P.2d at 1165 (citing Restatement § 266); *Beals v. Tri-B Assocs.*, 644 P.2d 78, 80–81 (Colo. App. 1982) (citing Restatement § 265); *see also U.S. Welding, Inc. v. Advanced Circuits, Inc.*, 420 P.3d 278, 283 (Colo. 2018) ("There has been no suggestion here of impossibility, frustration of purpose, or any other justification for a requirement to modify, or restructure, the original contract." (citing Restatement ch. 11, which addresses impracticability and frustration)).

frustration of purpose doctrine "deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other." *Cent. Kan. Credit Union v. Mut. Guar. Corp.*, 102 F.3d 1097, 1103 (10th Cir. 1996) (quoting Restatement § 265 cmt. a). Frustration of purpose applies when a "party's principal purpose [in entering the contract] is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement § 265. A party seeking to avoid its obligations on this basis "must show total, or near total, destruction of the essential purpose of the transaction." *Beals v. Tri-B Assocs.*, 644 P.2d 78, 80–81 (Colo. App. 1982). The frustrated purpose "must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." Restatement § 265 cmt. a.

HUB claims that "the principal purpose of the Agreement between HUB and Recapture was frustrated when Recapture lost its relationship with Oxford." [Doc. 46 at 10]. But, as with impossibility, HUB fails to identify any contract language or otherwise adduce evidence to show that a relationship with *Oxford* was either the principal purpose or a basic assumption of the Agreement. The Agreement's recitals emphasize that Recapture is a broker "offering specialty commercial insurance products, captive consulting, [and] other services" and that HUB and Recapture desired a relationship in which HUB would "utilize the resources of [Recapture]." [Doc. 46-5 at 2]. Consistent with that purpose, Recapture's scope of service went no further than providing access to its network of providers and assisting with the placement of coverage. *See* [*id.* at § 10; Doc. 53 at 11 (Recapture making this point)].

Nor has HUB pointed to any other evidence suggesting that the Agreement was

premised on a relationship with Oxford. To the contrary, HUB submits that "[t]he surrounding circumstances and commercial context indicate both parties understood the Agreement's principal purpose was HUB's access to captive insurance policies through Recapture's established supplier relationships." [Doc. 46 at 12]. The Court agrees with this assessment. Through Mr. Stock's "extensive" network, Recapture had relationships with providers other than Oxford and obtained a proposal for Crest through one of those other providers. *See* UMF ¶¶ 3, 25–26. So even if HUB is correct that the introduction to Oxford became worthless, [Doc. 47 at 14], the Court respectfully disagrees that Recapture's overall performance was "virtually worthless" to HUB, *see* Restatement § 265 cmt. a. Likewise, it makes little difference that the loss of Oxford made the Agreement less valuable for HUB. *See* [Doc. 46 at 12]. The fact that a contract becomes "less profitable" or even causes an affected party to "sustain a loss" is insufficient to trigger frustration, *id.*; the destruction of the contract's purpose must be "total" or "near total," *see Beals*, 644 P.2d at 81 (finding insufficient frustration where at least one purpose of the transaction was fulfilled and plaintiffs would still receive a "substantial profit," even if it was less than they hoped).

This distinguishes HUB's principal case, *Beltronics, Inc. v. Eberline Instrument Corp.*, 369 F. Supp. 295 (D. Colo. 1974) ("*Beltronics I*"), *aff'd*, 509 F.2d 1316 (10th Cir. 1974) ("*Beltronics II*"). *See* [Doc. 46 at 10–12; Doc. 47 at 16–17]. There, the parties had entered into a contract that gave Beltronics the exclusive right to sell capacitors produced by Eberline. *Beltronics II*, 509 F.2d at 1318. The capacitors were made specifically for a third company, Western Electric, and the district court found that it was a "basic assumption that Western Electric, which was the only market of any consequence for the

products here involved, would continue to be a market for those products and that without Western Electric as a market the venture could not succeed." *Beltronics I*, 369 F. Supp. at 298, 302. When Western Electric unilaterally ended its relationship with Beltronics, the district court and Tenth Circuit both held that Eberline was excused from the contract. *Beltronics I*, 369 F. Supp. at 302; *Beltronics II*, 509 F.2d at 1319. But there is simply no evidence that Oxford was comparably essential (or mutually perceived as such) to the Parties' Agreement here.[9] *Cf. Viking Supply v. Nat'l Cart Co.*, 310 F.3d 1092, 1096–97 (8th Cir. 2002) (finding exclusive distributorship contract frustrated where there were only two potential purchasers and it was "elementary" that contract "would make little sense, if any" if one purchaser became unwilling to buy from the distributor).

Accordingly, the Court respectfully agrees with Recapture that the Agreement's principal purpose was not frustrated by the loss of Recapture's relationship with Oxford.[10] *See* [Doc. 44 at 13–14; Doc. 53 at 11–12]. Plaintiff's Cross-Motion is **GRANTED** as to the frustration of purpose defense, and Defendant's Cross-Motion is **DENIED**.

### D. Nonperformance by Recapture

The foregoing analysis disposes of HUB's nonperformance arguments. HUB pleaded nonperformance by Recapture as a defense, [Doc. 16 at 6 ¶ 4]; *see, e.g.*, *Hemmann Mgmt. Servs. v. Mediacell, Inc.*, 176 P.3d 856, 859 (Colo. App. 2007), but

---

[9] At one point, HUB suggests that Oxford could have been viewed as essential because Oxford was the carrier that had provided coverage for Citywide. [Doc. 47 at 11]. But HUB cites no evidence to support this claim.

[10] To be clear, however, the Court goes no further. The Court does not adopt Recapture's suggestions that the Agreement's principal purpose was "fulfilled with Recapture's introduction of [HUB] to Oxford," [Doc. 53 at 13], or that the 300% "penalty" in the Non-Circumvention/Exclusivity provision was designed to allocate the risk that a captive insurance provider would terminate its relationship with Recapture, [Doc. 44 at 14].

Recapture must also demonstrate its own performance as an element of its claim, *see W. Distrib. Co.*, 841 P.2d at 1058. Recapture's Cross-Motion addresses its performance in both respects. [Doc. 44 at 9, 11–12]. HUB does not specifically address a nonperformance defense, but it generally argues that Mr. Stock "could no longer perform under the [Agreement]" once he lost his relationship with Oxford. [Doc. 47 at 9–10].

HUB's position is unsupported by the language of the Agreement. As explained, the Agreement only contemplates that Recapture will provide HUB with access to its network and assist with the placement of requested coverage. [Doc. 46-5 at § 9]. Mr. Stock undisputedly introduced HUB to Oxford, initially assisted with placing coverage through Oxford, and then obtained an alternative proposal from a different provider after Oxford cut him off. HUB identifies no contract provision entitling it to anything more, let alone a specific bindable proposal placed with a specific provider at a specific time. And HUB's various theories about what the Agreement was "predicated on" or "expected" of Mr. Stock invoke the types of unwritten assumptions that the impracticability and frustration defenses aim to address. [*Id.*]. The Court found those arguments unavailing and reaches the same conclusion here. Recapture has adequately established, as a matter of law, that it performed under the Agreement.

**E. Waiver**

Recapture next seeks summary judgment on HUB's waiver defense. *See* [Doc. 44 at 14–16]. "Waiver is the intentional relinquishment of a known right." *Avicanna Inc. v. Mewhinny*, 487 P.3d 1110, 1115 (Colo. App. 2019). Waiver may be implied through conduct, such as when a party acts inconsistently with the assertion of a right. *In re Marriage of Hill*, 166 P.3d 269, 273 (Colo. App. 2007). But "the conduct itself should be

free from ambiguity and clearly manifest the intention not to assert the benefit." *Avicanna*, 487 P.3d at 1115 (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)). Where, as here, the contract at issue includes an anti-waiver clause, "the party asserting a waiver must show a clear intent to waive both the clause and the underlying contract provision." 13 Williston on Contracts § 39:36 (4th ed., May 2026 update).[11] To imply such a waiver through conduct, the conduct must be "so pervasive that it spoke louder than the word of the anti-waiver clause." *Blue Horizon Therapy LLC v. Kathy & Johnny, Inc*, No. 20CA1434, 2021 WL 12341808, at *5 (Colo. App. Dec. 9, 2021) (emphasis added) (cleaned up) (quoting *Woods v. Monticello Dev. Co.*, 656 P.2d 1324, 1327 (Colo. App. 1982)). Whether waiver has occurred is ordinarily a question of fact, but waiver may be resolved as a matter of law if the material facts are undisputed. *See Avicanna*, 487 P.3d at 1115.

Colorado case law confirms that implied waiver generally requires repeated or prolonged failures to assert a particular contract provision, especially when an anti-waiver or anti-modification provision is present. In *La Plata Open Space Conservancy v. Baker*, for example, the Colorado Court of Appeals found no waiver of a conservation easement's provisions that prohibited agricultural activities in certain areas and required all modifications to be recorded. No. 23CA1151, 2025 WL 274558, at *4–6 (Colo. App. Jan. 23, 2025). The court concluded that four annual inspection reports marking "no violations" of the easement did not effect waiver, even though agricultural activities were occurring

[11] As set forth above, Section 13(l) of the Agreement is entitled "No Waiver" and provides, "No failure on the part of the Company to exercise and no delay in exercising any right, power, remedy hereunder shall operate as a waiver thereof; nor shall any exercise thereof, or the exercise of any other right, power or remedy hereunder." [Doc. 46-5 at § 13(l)]. The Agreement also requires any waiver to be made in writing. [*Id.* at § 13(f)].

in prohibited areas, because it was unclear if the inspector had observed the same agricultural activity every year. *Id.* at *5 Nor did the conservation agency's executive director waive any contractual right by failing to report any violations, because he relied on the inspection reports in making that decision. *Id.* at *6. While this conduct might have prompted "additional due diligence" by a party bound by the easement, it "simply [did] not constitute the type of <u>pervasive</u> conduct that would speak louder than the recording requirement in the mind of a reasonable person." *Id.* (cleaned up) (emphasis added); *cf., e.g.*, *Cordillera Corp. v. Heard*, 612 P.2d 92, 93 (Colo. 1980) (concluding that arbitration clause was waived where the parties had litigated the case in court for more than a year and submitted multiple filings); *Turner Constr. Co. v. CCN Lodging LLC*, No. 21CA0844, 2022 WL 22926706, at *4 (Colo. App. Dec. 29, 2022) (defendant impliedly waived time-is-of-the-essence clause by ignoring or denying plaintiff's multiple requests for extensions for months and then continuing move forward with the project with plaintiff for an additional ten months after the original completion date had passed).

HUB has not adduced facts to create a genuine issue of material fact as to pervasive conduct. While HUB cites to various pieces of evidence for waiver, this evidence describes just two conversations in September 2021 between Mr. Stock and HUB employees—one with Mr. Tauber and Ms. Burger, and another with Michael Abreu. *See* [Doc. 47 at 18; Doc. 47-8 at 72:25–74:10; Doc. 47-9 at 2]. In these conversations, Mr. Stock suggested that HUB "call Oxford directly to try and convince Oxford to write a captive solution for Crest." [Doc. 44-1 at ¶ 11]. The Court does not find Mr. Stock's statements to be unambiguously inconsistent with the Exclusivity/Non-Circumvention provision, because the provision also entitled him to payment if HUB dealt directly with a

carrier he had introduced. *See* [Doc. 46-5 at § 10]. And HUB apparently did not inform Recapture that it was continuing to negotiate with Oxford during late 2021 and early 2022, so the Parties never had another conversation to clarify whether Mr. Stock was waiving either the anti-waiver provision or any of his rights under the Exclusivity/Non-Circumvention provision. *See* [Doc. 47-8 at 79:9–81:22]. Even if Mr. Stock's suggestions that HUB "reach out directly with Oxford" were inconsistent with the Exclusivity/Non-Circumvention provision, [*id.* at 73:10–21], HUB does not explain why two conversations in a short time period establish conduct "so pervasive" that it clearly manifests intent to waive the anti-waiver provision, *Woods*, 656 P.2d at 1327 (quotation omitted). In fact, HUB fails to even acknowledge that implied waiver of an anti-waiver provision requires "pervasive" conduct, much less address this standard with specific record evidence in any detail. *See* [Doc. 47 at 18–20]. The Court respectfully declines to make HUB's arguments for it and agrees with Recapture that HUB has established no genuine dispute as to whether Mr. Stock waived his rights under the Exclusivity/Non-Circumvention and anti-waiver provisions. *See* [Doc. 44 at 14–16].

In sum, the Court respectfully concludes that Recapture has established the essential elements of its breach of contract claim as a matter of law. The Court finds no genuine disputes of fact as to the elements of this claim or the viability of HUB's asserted defenses. Accordingly, Recapture is entitled to summary judgment on its breach of contract claim on the issue of liability. The Court will set a Status Conference to address damages. Plaintiff's Cross-Motion is **GRANTED**, and Defendant's Cross-Motion is **DENIED** as to the breach of contract claim.

## II. Remaining Claims

While Plaintiff's Cross-Motion only addresses the breach of contract claim, Defendant's Cross-Motion goes on to challenge the remaining claims—breach of the implied duty of good faith, promissory estoppel, and unjust enrichment. *See* [Doc. 46 at 13–21]. The Court considers these claims in turn.

### A. Breach of the Implied Duty of Good Faith

Recapture's Claim Two asserts that HUB breached the implied duty of good faith and fair dealing by dealing with Oxford directly, wrongfully terminating the Agreement, and refusing to pay Recapture. [Doc. 5 at ¶¶ 41–48].

Colorado law imbues all contracts with an implied duty of good faith and fair dealing. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). A plaintiff may invoke this duty "only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Id.* "Discretion in performance occurs when the parties, at formation, defer a decision regarding performance terms of the contract leaving one party with the power to set or control the terms of performance after formation." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) (quotation omitted). When one party uses this discretion to "act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached." *McDonald v. Zions First Nat'l Bank, N.A.*, 348 P.3d 957, 967 (Colo. App. 2015) (quotation omitted). Thus, a violation of the duty of good faith "gives rise to a claim for breach of contract." *City of Golden*, 138 P.3d at 292.

The implied duty of good faith will not, however, "contradict terms or conditions for which a party has bargained." *Amoco Oil*, 908 P.2d at 498. Nor can it "inject substantive

terms into the parties' contract" or obligate a party to "assume obligations that vary or contradict the contract's express provisions." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994).

HUB argues that the breach of implied duty claim fails because it is duplicative of the breach of contract claim and otherwise fails to identify any discretion in performance that HUB had under the Agreement. [Doc. 46 at 13–18; Doc. 58 at 6–9].

Recapture admits that its breach of implied duty claim "in some ways echoes its breach of contract claim" to the extent this claim relies on the Exclusivity/Non-Circumvention provision. [Doc. 53 at 14–15]. Recapture makes no effort to explain how this provision grants HUB any discretion, instead pivoting to argue that this claim can survive based on the termination clause. *See* [*id.*]. Indeed, the Court discerns no room for discretion in HUB's obligations under the Exclusivity/Non-Circumvention, which flatly prohibits HUB from engaging with providers introduced by Recapture. *See supra* Part I.A. The Court thus agrees with HUB that this portion of Claim Two fails as a matter of law.[12]

The breach of implied duty claim also fails with respect to the termination provision. Recapture emphasizes that this provision gives the Parties "full discretion" in deciding when to terminate the Agreement. [Doc. 53 at 15]. While a without-cause termination provision is discretionary in a sense, the Court agrees with HUB that this is not the type of discretion that triggers the implied duty of good faith. The duty only arises from a

[12] Although this portion of the implied duty claim is likely also duplicative of the breach of contract claim, dismissal of duplicative claims ordinarily occurs in the Rule 12 context. *See Doe ex rel. Doe v. Brighton Sch. Dist. 27J*, 612 F. Supp. 3d 1205, 1218–19 (D. Colo. 2020). The Court thus finds it appropriate to address the entirety of this claim under a Rule 56 standard.

discretion to "set or control the terms of performance." *Amoco Oil*, 908 P.2d at 498. Simply put, termination is not performance. And the Agreement's termination provision is an express, bargained-for term in a contract between sophisticated parties. Recapture cannot invoke the implied duty of good faith to contradict this term or otherwise inject new obligations into the Agreement. *See Amoco Oil*, 908 P.2d at 498; *see also FOCUS:Stateside LLC v. Nat'l Coal Transp. Ass'n*, No. 22CA0535, 2023 WL 12057870, at *3 (Colo. App. May 11, 2023) (affirming district court's rejection of implied duty claim where the contract "expressly detail[ed] [defendant's] right to terminate the contract for *any* reason"). Defendant's Cross-Motion is respectfully **GRANTED** as to the breach of implied duty claim.

**B. Promissory Estoppel and Unjust Enrichment Claims**

HUB next seeks summary judgment on Recapture's equitable claims. [Doc. 46 at 18–21]. As HUB points out, equitable claims are unavailable if "there is a plain, speedy, adequate remedy at law." *Szaloczi v. John R. Behrmann Revocable Tr.*, 90 P.3d 835, 842 (Colo. 2004). Thus, "[r]ecovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract." *Wheat Ridge Urb. Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007). The same is true for unjust enrichment; an express contract covering the subject matter "precludes any implied-in-law contract." *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).

Recapture does not dispute this and merely maintains that summary judgment on its equitable claims is premature given HUB's position that the Agreement is unenforceable. [Doc. 53 at 15–16]; *cf., e.g.*, 30 Williston on Contracts § 77:115 (4th ed.,

May 2026 update) (stating that courts may fashion equitable remedies if a contract becomes impracticable). But the Court has already disposed of HUB's arguments and granted Recapture summary judgment on its breach of contract claim. Because an enforceable contract covers the subject matter at issue, Recapture's equitable claims are precluded. Defendant's Cross-Motion is respectfully **GRANTED** as to Claims Three and Four.

## III. Motion to Exclude

The Court's summary-judgment rulings moot Recapture's Motion to Exclude. [Doc. 45]. At this point, the only remaining issue is the determination of Recapture's damages on the breach of contract claim. The Parties agree that HUB's expert, Kyle Dufford ("Mr. Dufford"), has proffered opinions relevant to whether the purported liquidated damages provision in the Agreement's Exclusivity/Non-Circumvention provision is enforceable. [Doc. 45 at 4 n.1; Doc. 48 at 1–2]. But Recapture disclaims any challenge to Mr. Dufford's opinions with respect to liquidated damages. [Doc. 45 at 4 n.1]. As described in the Motion to Exclude, the challenged opinions relate to whether the Parties' conduct and other portions of the Agreement are consistent with industry standards. *See* [*id.* at 3–4]. Having decided the question of liability on the breach of contract claim, the Court need not resolve these disputes. Accordingly, the Motion to Exclude is respectfully **DENIED as moot**. Recapture may make contemporaneous objections to Mr. Dufford's testimony at trial.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Partial Summary Judgment [Doc. 44] is **GRANTED**;

(2) Defendant's Motion for Summary Judgment [Doc. 46] is **GRANTED in part** and **DENIED in part**;

(3) Summary judgment is **GRANTED** in favor of Plaintiff on Plaintiff's breach of contract claim as to liability only;

(4) Summary judgment is **GRANTED** in favor of Defendant on Plaintiff's claims for breach of the implied duty of good faith, promissory estoppel, and unjust enrichment;

(5) Plaintiff's Motion to Exclude Expert Opinions [Doc. 45] is **DENIED as moot**; and

(6) A Telephonic Status Conference is **SET** for **October 15, 2026 at 10:00 a.m.** Counsel for the Parties shall participate using the following dial-in information: 571-353-2301; Access Code: 783456374. The Parties should be prepared to discuss what procedure should be used to determine damages in this case.

DATED: September 30, 2026

BY THE COURT:



Nina Y. Wang
United States District Judge